FALLS v. JACKSON.

4-7594                                    186 S. W. 2d 787

Opinion delivered April 9, 1945.

*Norton & Butler,* for appellant.

*W. J. Dungan,* for appellee.

SMITH, J. In 1914, Dr. W. C. Pryor of Memphis, Tennessee, as trustee for himself and associates, acquired title to east ½, section 3, township 5 north, range 6 east, St. Francis county, containing, according to the government survey, 261 acres. In 1923, Dr. Pryor acquired the interest of all of his associates, and became the sole owner, and his ownership is not questioned in this litigation. Dr. Pryor died testate in 1932, and his will was duly admitted to probate in Shelby county, Tennessee, on February 23 of that year. This will left the entire estate of the testator to his widow, Mrs. Kate Pryor, but contained no mention of the name of his only child, now Mrs. Falls, who was of full age at the time of the death of her father, the testator, and who was 43 years of age in September, 1942, when the stipulation was entered into reciting the facts above stated. Her mother was at that time 68 years of age.

The widow qualified as executrix of the will, and filed the inventory of the assets of the estate required by the laws of Tennessee, which contained the statement that the testator owned no real estate. No inheritance, or estate taxes were ever paid in this state.

Dr. Pryor paid no taxes in this state of any kind, after becoming the sole owner of the land in 1923, to the date of his death in 1932, nor has his widow or daughter paid any since. In other words, the land was apparently abandoned in 1923.

The main line of the Rock Island Railroad divides this land, and 87 acres thereof lie north of this railroad. The land south of the railroad lies in road improvement district No. 12, while that north of the railroad is in road improvement district No. 3, and all of the land lies within the tri-county drainage district, and in the St. Francis Levee District.

There has been an entire failure to pay the general state and county taxes or any of the improvement district taxes, by Dr. Pryor or by his widow or daughter. The land was twice sold to the state, and these sales were certified to the state, and decrees were rendered confirming them. The land sold time and again for the non-payment of the various improvement district taxes due thereon, but we do not recite these foreclosures, as it was stipulated that appellee, P. S. Jackson, has, through numerous deeds, acquired these titles.

Jackson sold and conveyed the land north of the railroad to S. Malkin, who required that an abstract of the title be furnished and this was done. The attorney who examined this abstract required, as a condition, for the approval of the title, that a quitclaim deed be obtained from Dr. Pryor's widow and sole devisee, and this deed was executed to Jackson by Mrs. Pryor on July 8, 1940, and Jackson now claims title under these numerous deeds.

In August, 1941, Jackson proceeded to clear the land for cultivation, and in doing so, sold timber of the value of $300. The remainder was piled and burned.

In January, 1942, Jackson proceeded to cultivate and improve the land, having cleared about 85 acres thereof. He built five houses on the cleared land, including a five-room house, and he built other houses thereon, and made numerous improvements. Jackson submitted an itemized statement of the cost of these improvements and of the sums paid to acquire the title of the various improvement districts, and that of the state, and also taxes subsequently paid, all totaling $7,523.43. The accuracy of this statement does not appear to be seriously questioned.

On May 4, 1942, Mrs. Camille Pryor Falls, the only child of Dr. Pryor, filed a complaint in equity, in which she alleged that she was the sole heir of her father, and that she had title as such to the land in controversy, subject to the dower rights of her mother, which had been conveyed to Jackson. She prayed that this dower right be asserted and set apart to the defendants, Jackson and Malkin, as their respective interests may appear. She prayed also: "that an accounting be had between plaintiff and the said defendants (Jackson and Malkin) covering the rental value of and improvements made upon any portion of said lands in excess of one-third thereof, and taxes and special assessments paid by them, including redemption, on plaintiff's two-thirds interest; and plaintiff prays that costs be adjudged as to the court shall seem equitable; and for all other general, equitable relief."

An answer was filed denying that plaintiff had any interest in the land, and reciting in detail the numerous foreclosure decrees rendered in favor of the respective improvement districts, and the sales to the state, and the decrees confirming such sales, all of which titles had been acquired by Jackson. The answer further alleged that: "The plaintiff failed to file an affidavit with her complaint to the effect that she had tendered the amount of taxes paid by the defendant to the State of Arkansas and to the various improvement districts mentioned herein and interest thereon and the improvements placed on said property."

Many pleadings and amendments thereof were filed, and much testimony was taken, including various stipulations of counsel, and the record is a very voluminous one. On final submission the cause was dismissed as being without equity, and this appeal is from that decree.

Many interesting questions are discussed, in the briefs of opposing counsel, among these the following: The effect of § 8131 of Shannon's Tennessee Code of 1932, and § 14525 of Pope's Digest; also the validity of the various sales for the general taxes and the improve-

ment district taxes, all of which are said to be void for imperfect and defective descriptions under which the land was sold, except the sale for the delinquent taxes due the St. Francis Levee District, which is said to be void for another reason, presently to be discussed. However, the question to which counsel chiefly addressed themselves is, whether appellant has not through long neglect of the land, abandoned and estopped herself from claiming title to any interest in it.

Jackson began obtaining deeds to this land on October 24, 1938, when he obtained a deed from the State Land Commissioner. Since then he has been to great trouble and expense in acquiring the title of the various improvement districts, and that of persons who had purchased from these districts. For all these purposes and for clearing and improving the land, he has expended over $7,000.

Appellant says that laches may not be pleaded as she seeks only legal relief. But she does ask the relief of an accounting of rents. This subject was reviewed in the recent case of *Neal* v. *Stuckey*, 202 Ark. 1119, 155 S. W. 2d 683, where it was held, to quote a headnote, that: "The doctrine of laches is that equity may refuse relief where it is sought after undue and unexplained delay, and where injustice would be done by granting in the particular case the relief prayed for." In that case the holder of the original title neglected for a period of 20 years to pay taxes on the land, but as the opinion recites, "permitted this land, which was in an uncleared and undeveloped condition, to be cleared and placed in a high state of cultivation thereby rendering the land much more valuable." It was there said, "under all of these facts and circumstances we think appellant was guilty of laches, and he will not be permitted to assert ownership in the land in controversy."

While one does not lose his title to land through the mere failure to pay the taxes due thereon, yet the facts here are that through long neglect and failure to pay the taxes, Jackson was led to believe that the land had

been abandoned, and he attempted to acquire the title of the apparent owners, having title under the numerous sales, for improvement district taxes of three kinds, and also from the state, which title had been confirmed in two separate confirmation suits.

When Jackson sold the land north of the railroad to Malkin, an abstract of title was prepared and a competent title examiner advised that the quitclaim deed from Mrs. Pryor would make a perfect title, as she was the apparent owner of the original title. That deed was obtained July 8, 1940, and not until October 17, 1942, was this suit filed, and during that interval Jackson, who had spent large sums of money in acquiring the title, as he supposed, spent even larger sums of money in improving the land. Under these circumstances, we think it would be not equitable to permit appellant to assert the long dormant title, and we therefore hold that she is estopped from doing so.

Moreover, while it is insisted that the sale to the state and the sales under the several decrees foreclosing the liens of the drainage districts, and of the road improvement districts, were all void because of the insufficient and defective descriptions of the land under which these sales were made, it is conceded that the sales for the levee taxes were made under a correct description and there were two of these foreclosure decrees. It is argued, however, that these decrees foreclosing the lien of the St. Francis Levee District, for the failure to pay the 1936-37 taxes, were both void, for the reason that the provisions of Act 15 of the special session of 1920 had not been complied with. Vol. 1, Acts of 1920, p. 169. Section 6 of this act requires the several clerks of chancery courts of the counties within the St. Francis Levee District to record and certify the list of land returned delinquent for the nonpayment of the levee taxes due thereon. It was held in the case of *Douglas* v. *Farris*, 197 Ark. 32, 122 S. W. 2d 558, that the provisions of this act are mandatory, and that a foreclosure decree rendered without compliance therewith was void, and might be collaterally attacked. It is conceded here that this act

had not been complied with, and it is therefore insisted that the foreclosure decrees are void.

However, § 13 of this act reads as follows: "No action shall be brought to set aside any decree rendered in any action to enforce the collection of such delinquent taxes, and to cancel any sale thereunder on the grounds mentioned in the preceding section, unless the plaintiff or some one for him shall first have tendered to the person holding or claiming the property under such sale a sum equal to the full amount for which the property was sold, together with ten (10%) per cent. per annum interest thereon from the date of sale, and also all taxes and special assessments meantime paid by such person or his grantors, together with ten (10%) per cent. per annum interest thereon from the several dates of payment; and if the plaintiff shall succeed in such action he shall not be entitled to any recovery on account of rents, nor be accountable for any improvements made since the sale, provided, that when such action shall be brought on the ground that the levee taxes had been actually paid, it shall not be necessary to show that a tender has been made of the amount for which the property was decreed to be sold."

It is not alleged or contended that the tender required by this section of the act was ever made. The insistence is that this requirement was waived inasmuch as the failure to make tender was not pleaded. To support this contention the cases of *Spain* v. *Johnson,* 31 Ark. 314; *Trigg* v. *Ray,* 64 Ark. 150, 41 S. W. 55, and *Sugg* v. *Utley,* 186 Ark. 560, 54 S. W. 2d 413, are cited.

Two answers may be made to this contention. The first is that it appears from the portion of the answer hereinabove copied, that the failure to make this tender was pleaded. It is true that the answer does not specifically refer to the St. Francis Levee District foreclosure, but it does allege failure to tender taxes paid, ". . . to the various improvement districts mentioned herein," and the St. Francis Levee District was one of these. The allegations of the answer are very

specific as to the numerous sales by the various improvement districts, including the St. Francis Levee District.

Another answer is, that the cases above cited construed what is now § 4663, Pope's Digest, which relates to sales for the nonpayment of the general state and county taxes, a proceeding in *invitium*. Here it is sought to avoid the solemn decree of the chancery court, and § 13 prescribes the conditions under which this may be done, one of these being that a tender shall be made equal to the full amount for which the property was sold, etc., with a proviso that this tender shall not be required in cases where the land has been sold for taxes previously paid. This is a condition precedent upon which the foreclosure decree may be attacked and no contention is made that the taxes for which the land was sold had been paid. Appellant says she is not attacking these decrees. Not expressly so, but necessarily so, as she cannot prevail without showing the invalidity of these foreclosure decrees. If either of them is valid, appellant has lost any title she may ever have had.

We conclude the decree is correct, and should be affirmed, and it is so ordered.